## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **P&I INSURANCE SERVICES, LLC,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | **NO. 20-5910** |
| | : | |
| **RISK AVERSE INSURANCE, LLC AND WILLIAM SPRAGUE,** | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

## MEMORANDUM OPINION

**Goldberg, J.**                                                                    **January 11, 2022**

Plaintiff P&I Insurance Services, LLC ("P&I"), a licensed insurance brokerage firm, through an amended complaint, has sued Defendants Risk Averse Insurance, LLC and its principals William Sprague and Mark Millison (collectively, the "Risk Averse Parties"). Plaintiff alleges, in part, that the Risk Averse Parties have stolen trade secrets and tortiously interfered with the non-compete contract of one of Plaintiff's former employees. In turn, the Risk Averse Parties have asserted amended counterclaims against P&I for defamation, disparagement, and tortious interference with business relations. In addition, Risk Averse and Sprague have brought these same claims via a Third-Party Complaint against P&I's principal, Andrew Porter.

P&I and Porter (collectively, "P&I") move to dismiss all claims brought against them pursuant to Federal Rule of Civil Procedure 12(b)(6). Millison also seeks leave to join the Third-Party Complaint against Porter. For the following reasons, I will grant in part and deny in part the Motion to Dismiss the Amended Counterclaim Complaint and Third-Party Complaint. I will also grant leave for Millison to join the Third-Party Complaint.

## I.     FACTUAL BACKGROUND

### A.     The Amended Complaint

The following facts are set forth in the Amended Complaint: [1]

P&I commenced business in 2008 as a licensed insurance broker.  Through its employees, P&I acts as an independent broker by procuring, securing, and servicing various types of insurance and risk management policies based on a client's individual needs.  P&I enters into agreements with clients wherein the client agrees that P&I will act as its broker of record.  It also enters into agreements with insurance companies in which it and the insurer agree that P&I will act as its appointed agent.  (Am. Compl. ¶¶ 13–17.)

Generally, P&I's clients' policies auto-renew and are not modified or terminated unless the client's needs change or the client decides to explore other insurance companies using P&I's services.  As a result, it is typical for clients to maintain policies for five or more years.  P&I uses computer software to monitor renewal dates to determine whether there are any changes that would require an alteration in the scope or type of policy.  This renewal date information is available only to the agency that is the broker of record for the policy.  (Id. ¶¶ 18–20.)

From November 2009 to January 17, 2019, Donald Blizzard, Jr. worked for P&I as an insurance producer, which is an employee who is licensed to sell insurance for a particular line of policies, such as casualty or property insurance.  On January 3, 2011, Blizzard and P&I executed a document entitled "P&I Insurance Services, LLC – Producer Agreement" ("Producer Agreement").  Blizzard entered into this Producer Agreement in exchange for the right to receive a split of

---

[1]     In deciding a motion under Federal Rule of Civil Procedure 12(b)(6), I must accept all factual allegations in the complaints being challenged as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief.  Atiyeh v. Nat'l Fire Ins. Co. of Hartford, 742 F. Supp. 2d 591, 596 (E.D. Pa. 2010).

commissions, for which he was previously ineligible, and which entitled him to a much greater

income.  In turn, Blizzard voluntarily assumed restrictive covenants, including the following:

- For a period of thirty-six months after termination of the Producer Agreement, Blizzard was prohibited from notifying or allowing notice to any of his commission accounts that he is no longer affiliated with P&I or affiliated with a direct or indirect competitor;

- For a period of thirty-six months after termination of the Producer Agreement, Blizzard was prohibited from soliciting or sharing any information regarding P&I's accounts with any other person or firm;

- For a period of three years after termination of the Producer Agreement, Blizzard was prohibited from directly or indirectly soliciting any of P&I's past, present, or future clients that were then under solicitation by Plaintiff; and

- For a period of ten years after termination of the Producer Agreement, Blizzard was prohibited from divulging, disclosing, or communicating to any third party, without P&I's written consent, P&I's proprietary and confidential information, including customer lists, business affairs, process information, procedures, forms and records, organizational files, and all aspects of Plaintiff's business which constitute confidential and business information, among other items.

(Id. ¶¶ 21–28 & Ex. A.)

As an employee, Blizzard had access to P&I's confidential, proprietary, and trade secret

information such as the identity of P&I's clients, the clients' financial information, and details of

the clients' policies such as renewal dates and premiums.  (Id. ¶ 30.)  Blizzard's express duties

included gathering client information, setting up client appointments for P&I, placing accounts and

policies with P&I, and assisting as a customer service representative and marketing person in the

placement of new business and securing renewals.  (Id. ¶¶ 29–33.)

On January 17, 2019, P&I terminated Blizzard's employment.  Within a matter of days after

termination, Plaintiff learned that Blizzard was working for Risk Averse, who provides similar

insurance management services, and was actively contacting Plaintiff's clients through LinkedIn.

P&I also discovered that, prior to termination, Blizzard had (a) downloaded a report from P&I's

software management system containing a list of P&I's clients and detailed information regarding

their policies, which was gathered from P&I's confidential and proprietary information, and (b) actively solicited at least one of P&I's clients to purchase a large policy through Risk Averse. P&I alleges that Risk Averse's principals, William Sprague and Mark Millison, had contact with Blizzard while he was working at P&I, and that they solicited Blizzard to join Risk Averse. P&I further contends that after the termination of Blizzard's employment, Blizzard continued to actively solicit P&I's clients. (Id. ¶¶ 34–42.)

Following the termination of his employment, Blizzard refused to return his company laptop and phone despite P&I's demand that he do so. This laptop contained P&I's confidential and proprietary information and trade secrets. Within two months following Blizzard's termination, there were more than forty notices of cancellation and/or broker of record changes ("BOR"s) for policies written for P&I clients, all of which had a relationship with Blizzard while he was employed by P&I. (Id. ¶¶ 43–45.)

After Sprague learned that Plaintiff had filed a legal action against Blizzard, Sprague contacted Drew Porter, the managing member of P&I. In a meeting with Sprague, Porter informed Sprague of Blizzard's continuing restrictive covenants and obligations to P&I as defined in the Producer Agreement. Although Sprague originally asserted that Risk Averse's and Blizzard's actions were not improper, Sprague subsequently discussed with Porter ways to resolve the litigation. P&I asserts that, during the course of these communications, and based on continuing BORs on client policies, it became clear that Sprague and Millison were causing Risk Averse to use the trade secret information Blizzard misappropriated from plaintiff. Specifically, Sprague caused Risk Averse to become a designated agent of at least one insurance company that had issued insurance policies to many of P&I's clients, thus allowing Blizzard and Risk Averse to collect commissions on policies issued to such clients without the need for the client to switch carriers. (Id. ¶¶ 47–49, 51–52.)

4

Blizzard and Risk Averse also allegedly engaged in a pattern of contacting P&I's clients who had an upcoming renewal date and requesting that they either cancel their policy and obtain a new policy through Risk Averse, or sign a document changing the broker of record from P&I to Risk Averse.  It is alleged that Risk Averse would not have had access to the identity and insurance coverage situation of P&I's clients without P&I's confidential information.  It is further asserted that Risk Averse would not have had the same level of success in stealing clients without the misappropriation of the renewal dates.  P&I avers that, despite knowledge that Blizzard improperly acquired this information, Risk Averse—at the direction of Sprague and Millison—accepted this information and used it to their advantage.  Overall, according to the Amended Complaint, Risk Averse's actions led to the switching of over 100 policies from P&I to Risk Averse in a less than two-year period after Blizzard's termination, at an annual loss to P&I of over $75,000.  (Id. ¶¶ 53, 55–58.)

On November 24, 2020, P&I filed suit against Defendants alleging (1) violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq.; (2) violations of the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5301, et seq.; (3) tortious interference with contractual relations; (4) tortious interference with business relations; (5) unfair competition; (6) unjust enrichment; and (7) civil conspiracy.  (Id. ¶¶ 61–113.)

**B.    The Amended Counterclaim Complaint and Third Party Complaint**

In connection with the litigation commenced by P&I, the Risk Averse Parties filed an Amended Counterclaim Complaint setting forth the following claims: (1) defamation per se; (2) defamation; (3) commercial disparagement; (4) tortious interference with business relationships; and (5) tortious interference with potential business relationships.  Thereafter, on March 11, 2021, Risk Averse and Sprague filed a substantially identical Third-Party Complaint against P&I's

principal, Drew Porter, setting forth the same claims.  The following facts are set forth in both the Amended Counterclaim Complaint and Third-Party Complaint.

On February 27, 2019, Drew Porter emailed Pam Lessig of Encompass Insurance Company ("Encompass") to inquire whether Encompass had appointed Risk Averse as an agent of record. Lessig responded that Encompass was in the process of appointing Risk Averse as an agent.  P&I then communicated to Lessig that, "Bill Sprague reached out to me . . . [s]ounds like he knows there was some wrongdoing on their end."  (Am. Countercl. Compl., ECF No. 44 ("Am. CC") ¶¶ 6–9; Third-Party Compl., ECF No. 29 ("TPC") ¶ 11–14.)

On April 1, 2019, P&I, through Drew Porter, emailed Lessig to indicate that the purpose of Risk Averse becoming an appointed agent of Encompass was to "steal" from P&I.  Porter indicated that Travelers' Insurance and Main Street America—two other insurers—had stopped processing BORs (broker of record changes) and AORs (agent of record changes) from individuals or businesses desiring to change from P&I to Risk Averse.  The following day, Porter notified Lessig that P&I planned to contact Mr. Eric Blew, the president of Pennsylvania Insurance Alliance, an entity comprised of member insurance broker businesses and which links its members with insurance carriers.  Porter then sent to Lessig draft documents in the state court litigation in the Delaware County Court of Common Pleas, including a petition for preliminary and permanent injunction, and requested that Encompass "acknowledge that they will not willful[ly] participate *in this activity* by suspending all AOR's [agent of record] until there is a clear decision from the court." That same day, P&I requested, via email, that Doug Moyer and Beth Snyder-Simpson—the Regional Sales Director and Regional Sales Manager for Encompass—"stand with P&I during this time." (Am. CC ¶¶ 12–24; TPC ¶¶ 17–29.)

On May 23, 2019, Risk Averse notified Doug Moyer of Encompass that there was no order prohibiting Mr. Blizzard from working in the insurance industry.  Indeed, Defendants never obtained

injunctive relief in the Delaware County matter, and they discontinued the matter in August 2019. Despite this information, Moyer indicated that Encompass was going to continue its halt on processing BORs for clients of P&I Insurance.  (Am. CC ¶¶ 25–30; TPC ¶¶ 30–36.)

On March 13, 2019, Risk Averse received notification from Main Street America that it received a superseding agent of record letter for Samantha and Brian Flory (the Florys") who had expressly desired to use Risk Averse as their broker.  The Florys, however, never signed a countermanding Broker of Record.  On March 18, 2019, Risk Averse forwarded the Florys' email expressly denying that they had signed a countermanding Broker of Record change, but Main Street America never responded.  Thereafter, on March 20, 2019, Main Street America notified Risk Averse that they would not be processing any BORs from P&I to Risk Averse.  (Am. CC ¶¶ 31–41; TPC ¶¶ 37–47.)

The Risk Averse Parties allege that, as a result of P&I's interference, Travelers' Insurance also refused to process BOR changes from individuals or businesses who were leaving P&I to work with Risk Averse.  The Risk Averse Parties also believe that P&I took affirmative actions that caused other third-parties to stop processing both BORs and AORs.  (Am. CC ¶¶ 42–46; TPC ¶¶ 48–52.)

### C.  <u>Procedural History</u>

P&I filed its Complaint against Risk Averse and William Sprague on November 24, 2020. Risk Averse and Sprague answered the Complaint, and, on February 17, 2021, filed an Amended Answer and Counterclaim.  Thereafter, on March 8, 2021, Risk Averse and Sprague filed an Amended Answer with an Amended Counterclaim, as well as a Third-Party Complaint against P&I's principal, Andrew Porter.

On April 28, 2021, P&I filed an Amended Complaint adding Marc Millison, another Risk Averse principal, as a Defendant.  Risk Averse, Sprague, and Millison answered that Complaint and filed an Amended Counterclaim including Millison as one of the Counterclaim Plaintiffs.

Following this latest round of pleadings, two motions were filed and are now pending: (1) P&I's Motion to Dismiss the Counterclaims, and (2) Millison's Motion for Leave to Join the Third-Party Complaint against Porter.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005).  The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.  Id.

The United States Court of Appeals for the Third Circuit has detailed a three-step process to determine whether a complaint meets the pleadings standard.  Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014).  First, the court outlines the elements a plaintiff must plead to state a claim for relief.  Id. at 365.  Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth."  Id.  Finally, the court "look[s] for well-pled factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.'"  Id. (quoting Iqbal, 556 U.S. at 679).  The last step is "a context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." Id. (quoting

Iqbal, 556 U.S. at 679).

## III.    DISCUSSION

### A.    Whether the Specific Emails Referenced in the Complaint May Be Considered on a Motion to Dismiss

"To decide a motion to dismiss, courts generally consider only the allegations contained in

the complaint, exhibits attached to the complaint and matters of public record." Schmidt v.

Skolas, 770 F.3d 241, 249 (3d Cir. 2014) (quoting Pension Benefit Guar. Corp. v. White Consol.

Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)) (internal quotation marks omitted). An exception

to this rule, however, is that "a 'document *integral to or explicitly relied upon* in the

complaint' may be considered 'without converting the motion [to dismiss] into one for summary

judgment." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis

and alteration in original) (citation and internal quotation marks omitted). "The rationale underlying

this exception is that the primary problem raised by looking to documents outside the complaint—

lack of notice to the plaintiff—is dissipated [w]here plaintiff has actual notice [] and has relied upon

these documents in framing the complaint." In re Burlington, 114 F.3d at 1426 (internal quotations

omitted). "[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic

document and not merely whether the extrinsic document was explicitly cited." Schmidt, 770 F.3d

at 249.

Here, P&I posits that the Risk Averse Parties have asserted claims for defamation,

disparagement, and tortious interference based primarily on the content of email communications in

their possession. Nonetheless, P&I asserts that the Risk Averse Parties failed to either attach these

emails to their Amended Counterclaim Complaint, cite the precise content of these emails, or

include the contextual emails that immediately precede and follow the subject emails. Moreover,

according to P&I, the Risk Averse Parties mischaracterize and misrepresent the emails, which frustrates a court's ability to fully consider the claims.[2]

I agree with P&I that the parties' email correspondence referenced within the Amended Counterclaim and Third-Party Complaint falls within the "narrowly defined types of material" that may be considered without converting a motion to dismiss to one for summary judgment.  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999).  The Risk Averse Parties' Amended Counterclaim Complaint describes and paraphrases these emails, often giving precise dates, recipients, and senders for each.  The Third-Party Complaint actually attaches these emails as exhibits.  Accordingly, it is clear that the Risk Averse Parties relied on these emails in framing their pleadings, thus mitigating any concerns about lack of authenticity or lack of notice.  Moreover, because the Risk Averse Parties rest their defamation per se, defamation, commercial disparagement, and tortious interference claims precisely on those emails, they are integral to the Amended Counterclaim and Third-Party Complaint.  Given these factors, I find that consideration of these emails in connection with the Motion to Dismiss is proper.

### B.    Whether the Defamation and Disparagement Claims Are Time Barred

P&I contends that the Risk Averse Parties' defamation and disparagement claims are time barred.  Taking all facts in the Amended Counterclaim Complaint and Third-Party Complaint as true, I decline to resolve this issue on a Rule 12(b)(6) motion.

Pennsylvania law provides a one-year statute of limitations for "an action for libel, slander or invasion of privacy."  42 Pa. Cons. Stat. § 5523(1).  The time within which a matter must be

---

[2]    Risk Averse does not appear to object to the consideration of these emails.  Rather, it simply argues that under Federal Rule of Civil Procedure 8, it was not required to attach these emails to the complaint.  While true that they had no affirmative obligation to attach the emails, that assertion does not answer the question of whether I may consider the emails when ruling on the Motion to Dismiss.

commenced is calculated from the time the cause of action accrued.  Id. § 5502.  Usually, a claim accrues at "the occurrence of the final significant event necessary to make the claim suable."  Barnes v. American Tobacco Co., 161 F.3d 127, 152 (3d Cir. 1998) (citing Mack Trucks, Inc. v. Bendix–Westinghouse Auto. Air Brake Co., 372 F.2d 18, 20 (3d Cir. 1966)).   "[I]t is the duty of the party asserting a cause of action to use all reasonable diligence to properly inform himself of the facts and circumstances upon which the right of recovery is based and to initiate suit within the prescribed period."  Crouse v. Cyclops Indus., 745 A.2d 606, 611 (Pa. 2000) (citing Hayward v. Med. Ctr. of Beaver Cty., 608 A.2d 1040, 1042 (1992)); see also Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983).

Generally, under Pennsylvania law, in cases of "media-public defamation"—i.e., where the publication is widely disseminated—the cause of action accrues on the date of publication of the defamatory statements, regardless of when the plaintiff became aware of the statements.  Barrett v. Catacombs Press, 64 F. Supp. 2d 440, 446–47 (E.D. Pa. 1999).   Where, however, the communications are secret and a plaintiff could not be expected to know of the defamatory statements, the discovery rule may apply.  Id.; see also Smith v. IMG Worldwide, Inc., 437 F. Supp. 2d 297, 306 (E.D. Pa. 2006).  The "discovery rule" will toll the running of the limitations period until "the plaintiff knows or reasonably should know (1) that he has been injured, and (2) that his injury has been caused by another party's conduct."  Romah v. Hygienic Sanitation Co., 705 A.2d 841, 857 (Pa. Super. Ct. 1997) (quotations omitted).  "[O]nce a plaintiff possesses the salient facts concerning the occurrence of his injury and who or what caused it, he has the ability to investigate and pursue his claim."  Id. (emphasis omitted) (quoting Baily v. Lewis, 763 F. Supp. 802 (E.D. Pa. 1991), aff'd 950 F.2d 721 (3d Cir. 1991)) (further quotations omitted).

"While a court may entertain a motion to dismiss on statute of limitations grounds, it may not allocate the burden of invoking the discovery rule in a way that is inconsistent with the rule that

a plaintiff is not required to plead, in a complaint, facts sufficient to overcome an affirmative defense." Schmidt v. Skolas, 770 F.3d 241, 251 (3d Cir. 2014) (internal citations omitted). The Third Circuit has stated, in the context of the discovery rule, that when "the pleading does not reveal when the limitations period began to run . . . the statute of limitations cannot justify Rule 12 dismissal." Barefoot Architect, Inc. v. Bunge, 632 F.3d 822, 835 (3d Cir. 2011). Thus, the commencement of the limitations period may be determined as a matter of law only "where the facts are so clear that reasonable minds cannot differ." Crouse, 745 A.2d at 611 (citing Hayward v. Med. Ctr. of Beaver Cty., 608 A.2d 1040 (Pa. 1992)).

Here, according to both the Amended Counterclaim and Third-Party Complaint, P&I's principal, Drew Porter, sent allegedly defamatory emails to Ms. Lessig in February and April 2019, and made defamatory statements to Mr. Blew in April 2019. P&I thus asserts that the Risk Averse Parties therefore knew of their claimed injury at least as early as March 20, 2019 because carriers had stopped processing BORs in March 2019. According to P&I, this knowledge was sufficient information on which to conduct an investigation, thus preventing the Risk Averse Parties from relying on the discovery rule. As the original Counterclaim Complaint was not filed until February 2021, P&I contends that the claims are time barred.

The Risk Averse Parties respond that, taking the facts in the Amended Counterclaim Complaint as true, there is a reasonable inference that they could not have reasonably known about the nature of the defamatory communications until P&I sued Risk Averse and Sprague in November 2020. The Amended Counterclaim Complaint alleges specifically that the defamatory statements at issue were included in P&I's document production accompanying their Rule 26 Disclosures, served via email on January 29, 2021. (Am. CC ¶¶ 59–60.) As such, the Risk Averse Parties allege that they did not discover the defamatory communication until January 29, 2021. (Id. ¶ 61.)

These varying arguments demonstrate that reasonable minds could differ regarding the accrual of the statute of limitations. While the Risk Averse Parties were aware of some injury resulting from the stoppage of the BORs in March 2019, nothing in the pleadings suggests that the Risk Averse Parties definitively knew that P&I was responsible. Moreover, and perhaps more importantly, while the Risk Averse Parties may have known that P&I was somehow involved with the carriers' refusal to process BORs, that knowledge is different than knowledge of whether the actual content of P&I's communications to the carriers was legally defamatory. Indeed, without the actual emails, the Risk Averse Parties could not bring plausible claims for defamation or commercial disparagement. Stated more simply, I cannot determine, at this stage of the case, that the Risk Averse Parties possessed the salient facts regarding the full scope of its injury and whether the communications contained statements that would indeed give rise to a plausible claim of defamation or disparagement. Accordingly, I will deny P&I's Motion to Dismiss on this ground.

C. **Whether the Email Communications at Issue Are Defamatory**

In Pennsylvania, the burden of proof for a common law defamation action is set forth by statute:

> (a) *Burden of plaintiff.*—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
>
> (1) The defamatory character of the communication.
> (2) Its publication by the defendant.
> (3) Its application to the plaintiff.
> (4) The understanding by the recipient of its defamatory meaning.
> (5) The understanding by the recipient of it as intended to be applied to the plaintiff.
> (6) Special harm resulting to the plaintiff from its publication.
> (7) Abuse of a conditionally privileged occasion.

42 Pa. Cons. Stat. § 8343(a).

"It is the role of the Court to determine whether the statements at issue were capable of a defamatory meaning." Smith v. IMG Worldwide, Inc., 437 F. Supp. 2d 297, 307 (E.D. Pa. 2006); see also Agriss v. Roadway Express, Inc., 483 A.2d 456, 461 (Pa. Super. 1984).   Put differently, "under Pennsylvania law, the Court acts as a gatekeeper to determine whether the statements are incapable of defamatory meaning in deciding whether any basis exists to proceed to trial." Mzamane v. Winfrey, 693 F. Supp. 2d 442, 480 (E.D. Pa. 2010).   Accordingly, the defamatory nature of a particular statement is proper for consideration on a motion to dismiss. See Mallory v. S&S Publishers, 168 F. Supp. 3d 760, 768 (E.D. Pa. 2016).

In making a threshold determination of whether a challenged statement is capable of defamatory meaning, a court must note that a statement is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) (citation and internal quotation marks omitted).   The statement "must provoke the kind of harm which has grievously fractured one's standing in the community of respectable society.   Id. (citation, internal quotation marks, and alteration omitted).   "The touchstone in determining whether a statement is capable of defamatory meaning is how the statement would be interpreted by the average person to whom it is directed." Mzamane, 693 F. Supp. 2d at 479.   The court must view the statements "in context" and determine whether the communication seems "to blacken a person's reputation or expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession." Baker v. Lafayette Coll., 532 A.2d 399, 402 (Pa. 1987) (quotation omitted).

Notably, "certain types of communications, while undoubtably offensive or distasteful, do not rise to the level of defamation because the law does not extend to mere insult." Emekekwue v. Offor, 26 F. Supp. 3d 348, 359 (M.D. Pa. 2014).   "Statements which are merely annoying or embarrassing or [are] no more than rhetorical hyperbole or a vigorous epithet are not defamatory."

14

Beverly Enters. v. Trump, 182 F.3d 183, 187 (3d Cir. 1999) (quoting Kryeski v. Schott Glass Tech., Inc, 626 A.2d 595, 601 (Pa. Super. Ct. 1993)).  Rather, the plaintiff "must have suffered the kind of harm which has grievously fractured his standing in the community . . . ." Tucker v. Phila. Daily News, 848 A.2d 113, 124 (Pa. 2004) (quotations omitted); see Beverly Enters., 182 F.3d 187–88 (finding statements made by Donald Trump during a crowded political rally, accusing the plaintiff of being a "criminal" who "devot[ed] [his] entire career to busting unions," and who was "just part of that World War II generation that danced on the graves of Jews" to be "reasonably understood as a vigorous and hyperbolic rebuke, but not a specific allegation of criminal wrongdoing" and therefore not actionable in defamation).

Moreover, "only statements of fact, rather than mere expressions of opinion, are actionable under Pennsylvania law" and, in order for an opinion to be deemed capable of defamatory meaning, it must "reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." Mzamane, 693 F. Supp. 2d at 477 (quoting Remick v. Manfredy, 238 F.3d 248, 261 (3d Cir. 2001)).  As the Third Circuit explained:

> Although there may be no such thing as a false opinion, an opinion which is unfounded reveals its lack of merit when the opinion-holder discloses the factual basis for the idea.  If the disclosed facts are true and the opinion is defamatory, a listener may choose to accept or reject it on the basis of an independent evaluation of the facts.  However, if an opinion is stated in a manner that implies that it draws upon unstated facts for its basis, the listener is unable to make an evaluation of the soundness of the opinion.  In such circumstances, if the underlying facts are false, the Constitution does not protect the opinion.

Redco Corp. v. CBS, Inc. et al., 758 F.2d 970, 972 (3d Cir. 1985).

Here, the Risk Averse Parties have identified three sets of defamatory communication: (a) the February 27, 2019 email suggesting that William Sprague acknowledged that he committed wrongdoing; (b) the April 2, 2019 email that Risk Averse was stealing clients; and (c)

15

communication to Eric Blew of Pennsylvania Insurance Alliance that Risk Averse was committing misconduct in stealing clients. P&I contends that such statements are nothing more than either rhetorical hyperbole or statements of opinion.

        1.   <u>February 27, 2019 email chain</u>

The first email chain occurred on February 27, 2019, when Drew Porter, on behalf of P&I, contacted Pam Lessig of the Encompass Insurance Company ("Encompass") to advise her that P&I had received a cancellation from one of P&I's clients that held a policy issued by Encompass. He stated,

> Hey Pam, Just checking in. Did you ever appoint Risk Averse Insurnace [sic] in Media? We just got a cancellation and that's really uncommon for our Encompass clients. Please let me know when you get a minute.

(ECF No. 29-1.)

When Lessig responded that it was in process, Porter wrote back:

> Bill Sprague reached out to me and wants to discuss payment for "Don's [Blizzard's] book". Not really sure what that means because Don was an employee and didn't own a book. Sounds like he knows there was some wrongdoing on their end. I hope they do not attempt to process any cancellation and re-writes with Encompass. That would be disparaging.

(<u>Id.</u>)

The Risk Averse Parties posit that this statement attempts to impute to Sprague an admission of wrongdoing. P&I counters that this email merely communicates Porter's opinion that Sprague's effort to purchase Blizzard's book was motivated by his awareness of "some wrongdoing on their end," and does not reference or suggest the existence of unstated facts. P&I goes on to reason that, even if the email could be read to suggest that Sprague had a guilty conscience, it does not approach the level of offensiveness necessary to support a defamation claim.

I agree with P&I that these emails are not capable of a defamatory meaning.   Under all objective readings of the challenged statements in context, the emails simply express Porter's *opinion* that he interpreted Sprague's action to be an admission of "some wrongdoing" as opposed to communicating a *fact* that Sprague actually committed wrongdoing.   Moreover, Porter disclosed the facts that supported his opinion—Sprague's attempt to purchase Blizzard's book of business. Certainly, Ms. Lessig could independently evaluate those facts and choose to accept or reject Porter's assessment of them, thereby precluding the statement from having defamatory meaning. Accordingly, I will dismiss the defamation and defamation *per se* claim based on this email.

            2.      April 1-2, 2019 Email Chain

The second email chain in question occurred on April 1–2, 2019, when Porter emailed Ms. Lessig requesting that Encompass stop processing BORs from P&I to Risk Averse.   When Ms. Lessig stated that Encompass management would not stop processing BORs, Porter wrote, "That's really disappointing that a brand new agent who's [sic] purpose was to steal from another broker is going to be allowed to do it.   I'm just so disappointment [sic], Pam.   Cant [sic] believe this."   (P&I Mot. to Dismiss, Ex. D.)

Porter then followed up with an email stating  "Just for the record:  Travelers & Main Street America stopped them from processing BOR's.   I'm sure Encompass can too."   (P&I Mot., Ex. D.) In a subsequent email that day, Mr. Porter sent to Ms. Lessig a draft copy of the preliminary injunction previously filed in the state court action with the following accompanying email:

> I wanted to pass this along from another carrier who said I can share this email.  This was what I feel is reasonable during this time since we have suit against Don for breach of contract.  He did sign a non-compete and non-solicit.  I was happy to see this come through from two companies so far, Travelers & MSA.  Do you think Encompass will authorize something similar and would communicate this to Risk Adverse?  Anything would help at this point.

(P&I Mot., Ex. E.)  The following day, following a face-to-face meeting, Mr. Porter again wrote to

Ms. Lessig:

> Thank you for your time to discuss this issue regarding AOR's [agents of record] to Risk Averse.  Since you were here today another one came in and that makes 10 in 2 days.
>
> I apologize for sending the draft documents which was for my attorney in my first email yesterday.  As per the conversation, please see attached for the filed court documents & the list of all AOR's that came in Monday and today.
>
> I'm requesting for Encompass Insurance to acknowledge they will not willful[y] participate in this activity by suspending all AOR's until there is a clear decision from the court.  As an agent appointed for over a decade with Encompass, it would be greatly appreciated considering this other agent has been appointed only 1 week.  My hope is that you, Beth, Doug and your legal team will stand up with P&I during this time.

(TPC, Ex. 2.)  Attached to this email was a copy of the petition for a preliminary injunction filed in

the State Court Action.

Again, these emails are not capable of defamatory meaning.  Primarily, it is abundantly

obvious from the context that P&I's language was merely hyperbole intended to suggest that

Blizzard and Risk Averse were improperly taking P&I's customers in violation of a private contract.

It was not intended to convey that any party was committing any type of criminal offense.

Second, the emails provided the recipient with all of the facts on which P&I's email was

based, including (a) Blizzard's signing of a non-compete and non-solicitation contract; (b) P&I's

sudden loss of clients to Risk Averse, where Blizzard was hired; (c) P&I's legal action against

Blizzard and efforts to obtain a preliminary injunction in state court.  Thus, Lessig and Encompass

had a basis to independently evaluate whether they concurred with P&I's legal assessment that there

was a violation of Blizzard's restrictive covenants and whether the Risk Averse Parties were part of

that violation.

18

Third, contrary to the Risk Averse Parties' argument, nothing in the emails can be construed as a misrepresentation that a court order or injunction existed.  In fact, by sending copies of the petition for injunction, P&I made clear that it was simply *seeking* such an injunction but had not actually obtained one.

Finally, nothing in P&I's request that Encompass stop processing BORs could be construed to be defamatory.  Rather, it was nothing more than a business effort to counteract what it perceived to be the Risk Averse Parties' own improper efforts to poach clients from P&I in violation of a business agreement.[3]  Encompass was free to decide whether or not it would acquiesce in P&I's requests.

Accordingly, I will dismiss the defamation claims based on this email string.

        3.    <u>Communications to Eric Blew</u>

The final set of communications on which the Risk Averse Parties rest their defamation claims involve unspecified communications to Mr. Eric Blew of The Pennsylvania Insurance Alliance.  According to the Amended Counterclaim Complaint and Third Party Complaint, P&I and Drew Porter solicited the Pennsylvania Insurance Alliance, through Mr. Blew, to stop processing valid BORs and/or AORs which would make Risk Averse the Agent/Broker of record.  (Am. Countercl. Compl. ¶¶ 14, 46(a), 49(c), 65(c).)  The Risk Averse Parties do not specifically identify the content of these challenged statements.

Under Federal Rule of Civil Procedure 8(a), a defamation plaintiff does not have to plead the precise defamatory statements or specifically name the person who made the statements.  <u>Knit</u>

---

[3]     The Risk Averse Parties suggest that they will be able to demonstrate pecuniary harm from these allegations.  Such a showing of pecuniary harm, however, is irrelevant if the communications that caused such harm are not capable of defamatory meaning.  Indeed, normal business communications often allow one business to lawfully profit at the expense of competitor.  The problem arises only if the communications can somehow be deemed defamatory.

With v. Knitting Fever, Inc., No. 08-cv-4221, 08-cv-4775, 2009 973492, at *6 (E.D. Pa. Apr. 8, 2009).  Nonetheless, a defamation count must, at minimum, provide sufficient notice to defendants in order to state a claim.[4]  Rishell v. RR Donnelley & Sons Co., No. 06-cv-4782, 2007 WL 1545622, at *3 (E.D. Pa. May 24, 2007).

Applying these liberal pleading standards, I find the Amended Counterclaim Complaint deficient.  Taking all allegations and inferences in the Counterclaim and Third-Party Complaint as true, the only statements made to Mr. Blew were that the Risk Averse Parties were taking P&I's clients in violation of Blizzard's non-compete clause and, as a result, Mr. Blew should help halt the processing of BORs/AORs.  Such statements, read in the light most favorable to the Risk Averse Parties, are not capable of defamatory meaning as they merely communicate (a) P&I's belief that the Risk Averse Parties' taking of clients was in violation of certain restrictive covenants P&I maintained with Mr. Blizzard, and (b) that changes in BORs or AORs should be halted until the issue was resolved.  In other words, it is an opinion for which the underlying facts were disclosed.[5]

Accordingly, I will dismiss the remainder of the Risk Averse Parties' defamation claims in their entirety.[6]

---

[4]     P&I argues that a defamation complaint must "specifically identify what allegedly defamatory statements were made by whom and to whom."  (P&I Mot. to Dismiss 23 (citing cases).)  This pleading standard, however, only governs defamation claim brought in Pennsylvania courts.  The pleading standard governing defamation claims in this Court, by contrast, is set out in Federal Rule of Civil Procedure 8(a), which does not require the same degree of specificity.  Rishell v. RR Donnelley & Sons Co., No. 06-cv-4782, 2007 WL 1545622, at *3 (E.D. Pa. May 24, 2007).

[5]     The Risk Averse Parties also seem to allege that there may be "other" defamatory statements to third parties (see Am. CC ¶ 55), but the Amended Counterclaim Complaint and Third-Party Complaint do not even identify the bare minimum of what those statements could be.  A simple allegation that P&I communicated to third-parties "business misconduct" on the part of the Plaintiffs fails to sufficiently put P&I on notice of the substance of this claim.

[6]     Having dismissed P&I's claims for defamation and defamation *per se*, I need not address P&I's separate argument to dismiss Millison's attempt to join these claims.  Moreover, I find no basis for P&I's claim that Millison is subject to Rule 11 sanctions for asserting defamation claims

**D.** **Whether Risk Averse Has Stated A Commercial Disparagement Claim**

"A commercially disparaging statement—in contrast to a defamatory statement—is one 'which is intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land chattels or intangible things, or upon their quality, . . . if the matter is so understood by its recipient.'" U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 924 (3d Cir. 1990) (quoting Menefee v. Columbia Broad. Sys., Inc., 329 A.2d 216 (Pa. 1974)).   The Third Circuit has distinguished between defamation and commercial disparagement claims, noting that a claim for defamation lies where the defamatory statement "imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct," while a claim for commercial disparagement lies where "the publication on its face is directed against the goods or products of a corporate vendor."  Id. (quotations omitted); see also Electro Med. Equip. Ltd. v. Hamilton Med. AG, No. 99–cv–579, 2000 WL 675716, at *2 (E.D. Pa. May 24, 2000).

A claim of commercial disparagement under Pennsylvania law has four elements: (1) a false statement; (2) that the publisher either intends to cause pecuniary loss or reasonably should recognize that publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows the published statement is false or acts in reckless disregard of its truth or falsity.  See Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co, 809 A.2d 243, 246 (Pa. 2002); see also McNulty v. Citadel Broad. Co., 58 F. App'x 556, 566 (3d Cir. 2003).

Here, none of the aforementioned communications can be deemed commercial disparagement as none of them are directed to the goods, products, or services of the Risk Averse

---

regarding communications that do not apply to him.  Aside from the fact that "the mere failure of a complaint to withstand . . . a motion to dismiss should not be thought to establish a rule violation," Simmerman v. Corino, 27 F.3d 58, 62 (3d Cir. 1994), Rule 11 clearly states that "[a] motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)."  Fed. R. Civ. P. 11(c)(2).  As P&I has failed to comply with this directive, I decline to consider its request for sanctions.

Parties.  As noted above, the emails do not cast doubt on the quality of the Risk Averse Parties' services or their competence to perform as an insurance broker.  Rather, they simply express the opinion of P&I and Porter that Blizzard and the Risk Averse Parties were taking P&I's clients in violation of a private contractual obligation between Blizzard and P&I.

In an effort to defend the commercial disparagement claim, the Risk Averse Parties argue only that Porter clearly contacted both Travelers' and Encompass to have them stop processing BORs and "[i]t may be worth investigating what exactly was said in these communications to both Travelers' and Encompass."  (Risk Averse Parties' Opp'n 8.)  This argument fails to overcome the pleading deficiencies inherent in both the Amended Counterclaim Complaint and Third-Party Complaint.  Accordingly, I will dismiss this claim.

### E.  <u>Tortious Interference with Prospective Business Relationships Claim</u>

The Risk Averse Parties' final cause of action is for tortious interference with contract.  In order to plead a viable cause of action for tortious interference with a contract under Pennsylvania law, a party must plead:  "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct."  <u>Remick v. Manfredy</u>, 238 F.3d 248, 263 (3d Cir. 2001) (internal quotations and citations omitted).  In determining whether there is a prospective contractual relationship in a tortious interference case, Pennsylvania courts consider "whether the evidence supports a finding that there was a reasonable likelihood that the contemplated contract would have materialized absent the defendant's interference."  <u>Devon Robotics v. DeViedma</u>, No. 09-cv-3552, 2010 WL 300347, at *3 (E.D. Pa. Jan. 25, 2010) (citing <u>Glenn v. Point Park Coll</u>, 272 A.2d 895, 898–99 (Pa. 1971)).

Both the Amended Counterclaim Complaint and the Third-Party Complaint adequately plead this cause of action. Specifically, the Risk Averse Parties allege that they had existing and prospective contractual relationships with both individuals and businesses, including the Florys, Travelers, MSA, and Encompass. (Am. CC ¶¶ 105, 108.) According to the Risk Averse Parties, P&I took affirmative actions to harm those business relationships by reaching out to the individuals/businesses to stop the processing of the AORs and BORs. (Id. ¶ 109.) As a result of these actions, the Risk Averse Parties claim that they lost premium revenue because these individuals and businesses were not able to transfer their business to Risk Averse. (Id. ¶ 108.)

In its Motion to Dismiss these claims, P&I asserts that such allegations are insufficient because the tortious interference claims are predicated on allegedly fraudulent statements made by Porter to insurance carriers regarding the existence of an injunction and the terms of Blizzard's restrictive covenants. Accordingly, P&I contends that the Risk Averse Parties must comply with the heightened pleading standards for fraud, set forth in Federal Rule of Civil Procedure 9(b), by stating with particularity the circumstances constating fraud or mistake including the date, time, and place of the alleged fraud.

P&I's argument is misplaced. The Risk Averse Parties do not allege "fraud" sufficient to trigger the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Rather, they assert only that P&I took affirmative actions to harm their prospective business relationships without having any privilege or right to do so. P&I's defense is that because it had a restrictive covenant with Blizzard, it was entitled to contact its clients and ensure that the Risk Averse Parties did not encroach on its existing business relationships. As nothing in these claims sounds in fraud, Rule 9(b) does not require more particularized pleading. Accordingly, I decline to dismiss this claim.

**F.**      **Whether Mark Millison's Tortious Interference Claims is Time Barred**

As noted above, Millison, one of Risk Averse's principals, was first added as a Defendant in P&I's Amended Complaint.  In response, the Risk Averse Parties amended their Counterclaim Complaint to include Millison as a Counterclaim Plaintiff in the defamation, commercial disparagement, and tortious interference claims.  P&I now contends that Millison's efforts to assert tortious interference claims are time barred.

Pennsylvania courts apply the two year statute of limitations of 42 Pa.C.S.A. § 5524(3) to tortious interference with contractual relations claims.  CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc., 357 F.3d 375, 383 (3d Cir. 2004).  The statute of limitations begins to run only once a plaintiff can assert and maintain an action.  Id.  Stated differently, "[a] claim under Pennsylvania law accrues at 'the occurrence of the final significant event necessary to make the claim suable.'"  Barnes v. Am. Tobacco Co., 161 F.3d 127, 136 (3d Cir. 1998) (internal citation omitted).

P&I contends that the Risk Averse Parties, including Millison, had actual knowledge of the alleged tortious interference at least as early as March 14, 2019 when the incident arose with the Florys, who were clients of P&I that Blizzard attempted to move to Risk Averse.  Although Sprague and Risk Averse filed their Complaint within two years of this incident, Millison did not join the Counterclaim until May 12, 2021, two months after the limitations period expired.

P&I's argument disregards the special tolling rules that apply to compulsory counterclaims. Federal Rule of Civil Procedure 13 provides, in part, that a counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."  Fed. R. Civ. P. 13(a)(1)(A).  The phrase "transaction or occurrence" is read broadly to include "a series of occurrences if they have a logical connection."  Baker v. Gold Seal Liquors, Inc., 417 U.S. 468 n.1 (1974).  If a claim is deemed compulsory, "'the institution of plaintiff's suit tolls or suspends

the running of the statute of limitations.'"  Giordano v. Claudio, 714 F. Supp. 2d 508, 522–23 (E.D. Pa. 2010) (quotations omitted).  This tolling for compulsory counterclaims "precludes plaintiff . . . from delaying the institution of the action until the statute has almost run on defendant's counterclaim so that it would be barred by the time defendant advanced it . . .", and does not prejudice the plaintiff, who "presumably has notice at the time the action is commenced of any counterclaim arising out of the same transaction as the main claim."  6C Wright & Miller, Fed. Prac. & Proc. § 1419, at 235–36 (2d ed. 1990).

Here, Millison's tortious interference claim is a compulsory counterclaim as it arises out of the same transaction or occurrence giving rise to P&I's own tortious interference claims against Millison.  P&I filed its Complaint against Risk Averse and William Sprague on November 24, 2020, thereby tolling the statute of limitation on any compulsory counterclaims.  Although the Amended Complaint, adding Millison as a Defendant, was not filed until April 2021, that Amended Complaint related back to the original November 24, 2020 filing date.  See Fed. R. Civ. P. 15(c) (holding that an amendment to a pleading relates back to the date of the original pleading).  Accordingly, Millison's statute of limitations for compulsory counterclaims was tolled as of November 24, 2020, meaning that his tortious interference claim was indeed timely filed.

### G.   Risk Averse's Claims for Attorneys' Fees

P&I also seeks to strike the Risk Averse Parties' claims for attorneys' fees, arguing that "[t]here is no basis for an award of fees for any of these common-law claims."  (P&I's Mot. to Dismiss 30.)

"The standard for striking a complaint or a portion of it is strict, and 'only allegations that are so unrelated to the plaintiffs' claims as to be unworthy of any consideration should be stricken.'"  Steak Umm Co., LLC v. Steak'Em Up, Inc., No. 09-cv-2857, 2009 WL 3540786, at *2 (E.D. Pa. Oct. 29, 2009) (citing Johnson v. Anhorn, 334 F. Supp. 2d 802, 809 (E.D. Pa. 2004)).  "The

purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." McInerney v. Moyer Lumber and Hardware, Inc., 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002). Although "[a] court possesses considerable discretion in disposing of a motion to strike," such motions are "not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." Ford-Greene v. NHS, Inc., 106 F. Supp. 3d 590, 615 (E.D. Pa. 2015) (quoting River Road Dev. Corp. v. Carlson Corp., No. 89-cv-7037, 1990 WL 69085, at *3 (E.D. Pa. May 23, 1990)).

Here, the parties have provided almost no information about the request for attorneys' fees or the basis for striking such request. Although I recognize that, under the "American Rule," "each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary," Hensley v. Eckerhart, 461 U.S. 424, 429 (1983), attorney's fees and expenses may be awarded to a prevailing party in a federal litigation where authorized by statute, court rule, or contract. Mifflinburg Telegraph, Inc. v. Criswell, 277 F. Supp. 3d 750, 807 (M.D. Pa. 2017) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 US. 240 (1975)). Given that a basis for attorneys' fees may exist in this case, and in light of the fact that the moving party bears the burden of showing that allegations in a complaint should be stricken under Rule 12(f), I decline to grant P&I's motion in this regard.

### G.      Defendant and Counterclaim Plaintiff Marc Millison's Motion for Leave to Join the Third-Party Complaint Against Third-Party Defendant Drew Porter

The final issue before concerns the Third-Party Complaint. As noted above, Risk Averse and Sprague filed a Third-Party Complaint against P&I's principal Drew Porter. After Millison was added as a Defendant in its Amended Complaint, he and the other Risk Averse Parties filed a motion

to either (a) allow Millison to join the Third-Party Complaint against Porter, or (b) permit Risk Averse and Sprague to amend the Third-Party Complaint to add Millison as a co-Plaintiff.

Motions to amend pleadings are governed by Federal Rule of Civil Procedure 15(a).  Once a responsive pleading has been filed, "a party may amend its pleadings only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Leave to amend is generally granted unless there is: (1) undue delay or prejudice; (2) bad faith; (3) dilatory motive; (4) failure to cure deficiencies through previous amendment; or (5) futility.  The ultimate decision to grant or deny leave to amend is a matter committed to the Court's sound discretion.  <u>Coventry v. U.S. Steel Corp.</u>, 856 F.2d 514, 518 (3d Cir. 1988).

Where a plaintiff seeks leave to amend a complaint to add new parties to the action, the Court must also consider the proposed amendment under Federal Rule of Civil Procedure 20(a).  Rule 20(a)(1) governing joinder of plaintiffs sets forth a two part test:

> Persons may join in one action as plaintiffs if: (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action.

Fed. R. Civ. P. 20(a)(1).

Motions to join parties under Rule 20 fall squarely within the discretion of the court, which must determine whether the proposed joinder comports with the "principles of fundamental fairness."  <u>Yue v. Lor</u>, No. 20-cv-5099, 2021 WL 1712279, at *2 (D.N.J. Apr. 29, 2021) (quoting <u>N.J. Mach. Inc. v. Alford Indus., Inc.</u>, No. 89-cv-1879, 1991 WL 340196, *1 (D.N.J. Oct. 7, 1991)).  The purpose of Rule 20 is to "promote trial convenience and expedite the final determination of the case, thereby preventing multiple lawsuits."  <u>Bell v. Lockheed Martin Corp.</u>, No. 08-cv-6292, 2010 WL 3724271, at *13 (D.N.J. Sept. 15, 2010) (citing <u>Hagan v. Rogers</u>, 570 F.3d 146, 157 (3d Cir. 2009)).  "Courts interpret Rule 20 liberally to 'achieve the rule's goals of promot[ing] judicial

27

economy and efficiency.'" <u>Yue</u>, 2021 WL 1712279, at *2 (quoting <u>Snodgrass v. Ford Motor Co.</u>, No. 96-cv-1814, 2002 WL 485688, at *2 (D.N.J. Mar. 28, 2002)); <u>see also</u> <u>Miller v. Hygrade Food Prod. Corp.</u>, 202 F.R.D. 142, 144 (E.D. Pa. 2001). "[T]he impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." <u>Hagan</u>, 570 F.3d at 153 (quoting <u>United Mine Workers of Am. v. Gibbs</u>, 383 U.S. 715, 724 (1966)).

Here, Millison's request for joinder is both appropriate and directed towards judicial economy and efficiency. Millison seeks to maintain a claim for tortious interference against Drew Porter identical to that filed by P&I and Sprague, who are his co-Defendants in the original action and his co-Plaintiffs in the Counterclaim. Allowing him to join the existing Third-Party Complaint, in lieu of filing his own separate action against Porter, will expedite efficient resolution of this matter. Moreover, permitting such joinder will not result in any unfairness or prejudice to P&I or Porter.

P&I opposes Millison's joinder on several grounds, none of which have merit. First, it contends that joinder would be futile because the Third-Party Complaint cannot withstand a motion to dismiss. As set forth above, however, although the Third-Party Complaint's defamation and defamation per se causes of action will be dismissed under Rule 12(b)(6), I find that the tortious interference cause of action states a plausible claim. Thus, Millison's joinder would not be futile.

Second, P&I contends that the addition of Millison to the Third-Party Complaint "smacks of bad faith" because Millison waited to join in the litigation until P&I asserted claims against him. Such a bareboned allegation does not provide a sound basis for denial of leave to join.

Finally, P&I asserts that Millison's Motion for Leave to Join is procedurally deficient because he failed to file a brief in accordance with Local Rule of Civil Procedure 7.1(c), which states, "[e]very motion not certified as uncontested . . . shall be accompanied by a brief containing

2:20-cv-05910-MSG   Document 96   Filed 01/11/22   Page 29 of 29

a concise statement of the legal contentions and authorities relied upon in support of the motion." Local Rule of Civil Procedure 7.1(c).  I note, however, that the combination of Millison's Motion and reply brief adequately satisfy this requirement by setting forth the relevant legal authority justifying the joinder.

As I find that the proposed joinder comports with the principles of fundamental fairness, I will grant Millison's Motion for Leave to Join the Third-Party Complaint to the extent it has not already been dismissed under Rule 12(b)(6).

## IV.   CONCLUSION

For all of the foregoing reasons, I will grant P&I's Motion to Dismiss in part and deny it in part as set forth in this Memorandum.[7]  In addition, I will grant Millison's Motion to Join the Third-Party Complaint against Porter.  An appropriate Order follows.

---

[7]     Generally, a court should freely grant leave to amend the complaint when justice so requires "unless it would be inequitable or futile."  Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).  Here, the Counterclaim Complaint has already been amended several times and is on its fourth iteration.  As the Risk Averse Parties have been unable to cure the deficiencies to date, I find that further amendment will be futile.